**EASTERN AIR LINES, Inc.,**
Appellant,

v.

**UNION TRUST CO. et al., Appellees.**

**Nos. 11991, 11992.**

United States Court of Appeals District of Columbia Circuit.

Argued June 6, 1956.

Decided Sept. 20, 1956.

Petition for Rehearing In Banc Denied Jan. 9, 1957.

---

Messrs. Joseph W. Henderson, Philadelphia, Pa., and Richard W. Galiher, Washington, D. C., with whom Mr. John M. Aherne, New York City, of the bar of the Supreme Court of New York, was on the brief, for appellant.

Mr. David G. Bress, Washington, D. C., with whom Messrs. Sheldon E. Bernstein, Alvin L. Newmyer and Jo V. Morgan, Jr., Washington, D. C., were on the brief, for appellees.

Before EDGERTON, Chief Judge, and WILBUR K. MILLER and FAHY, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

When these cases were first before us, we reversed the judgments against Eastern Air Lines in an opinion to which reference is made for a statement of the factual situation. 1955, 95 U.S.App.D.C. 189, 221 F.2d 62. We held that, since the pilot of a National airliner flying in the general vicinity was admittedly not in a position during all of the critical period to hear radio messages sent by the control tower to the Eastern plane, and since he appeared not to have been fully attentive to such tower broadcasts as he actually did hear during that period, the National pilot's negative testimony that he heard no landing clearance given the Eastern plane did not have enough probative value, as against the tower operator's affirmative statement that he gave such clearance, to form an issue of fact for the jury.

Having so held, we concluded the trial court erred in submitting to the jury the question whether the Eastern plane had negligently deviated from the traffic pattern without tower clearance to do so, when it was struck from above and behind by the Bolivian plane. Because of that conclusion, we reversed the judgments without reaching other grounds for reversal advanced by Eastern Air Lines.

There followed a petition for a writ of certiorari, with respect to which the Supreme Court said December 5, 1955, "The petition for writ of certiorari is granted and the judgment is reversed." 350 U.S. 907, 76 S.Ct. 192. On petition for rehearing by Eastern Air Lines, the Supreme Court ordered on February 27, 1956:

"On consideration of the petition for rehearing the order of December 5, 1955, ante, p. 907 is reopened and is modified by directing that the case be remanded to the Court of Appeals to permit that court to pass upon the several issues left undecided by our reversal of its judgment." 350 U.S. 962, 76 S.Ct. 429.

Thus the cases are again before us. Supplemental briefs have been filed and further oral argument has been heard.

 Eastern Air Lines urges it was deprived of a fair trial by the plaintiff's "clear design to destroy the character, integrity and credibility of the tower witnesses by baseless charges of fabrication and concoction." The trial judge told the jury such charges had first been made and then withdrawn, and then charged in regard thereto: "So, therefore, I want

to immediately have you dispel that from your minds, because counsel have said there is no charge of fabrication or concoction or subornation of perjury, if you will, in this case." While the record furnishes some basis for supposing the plaintiffs had the design attributed to them by Eastern, we think the court's admonition was adequate to remove any possible prejudice from the minds of the jurors if they were otherwise unprejudiced, and that reversal on this ground alone is not warranted.

■ Eastern says it was gravely prejudiced by the fact that the jury heard all the evidence in the non-jury case; that alleged fault on the part of the tower operators was imputed to it by the jury. Even though we assume that Eastern was disadvantaged because the cases against it and the non-jury cases against the Government were tried at the same time, Eastern for reasons then deemed prudent consented to consolidation of the cases for simultaneous trial. It cannot now complain because this was done.

■ In our first opinion we rejected Eastern's contention that the trial court erred in receiving in evidence the approach and landing pattern offered as an exhibit by the appellees because it had not properly been officially prescribed; and held the Eastern pilots were required to follow the pattern unless landing clearance, which authorizes deviation from it, had been given by the tower. Eastern urges that we reconsider the ruling and hold the pattern inadmissible. We adhere to our original holding in this regard.

Finally, Eastern urges that the trial judge erred in denying its alternative motions for judgment *non obstante veredicto* or for a new trial, filed under Rule 50(b), Federal Rules of Civil Procedure.[1] The motion asked the court to set aside the verdicts in favor of Bridoux, the Bolivian pilot, as well as those against Eastern. The appellees moved for a new trial of their cases against Bridoux if a new trial were awarded to Eastern Air Lines.

The new trial issue includes the inquiry whether the verdicts were against the clear weight of the evidence, whether they were induced by passion, sympathy and prejudice, and whether a miscarriage of justice will result therefrom. These included inquiries, particularly the latter, contain a combination of questions. One phase of resulting injustice is asserted by the appellant in this quotation from its supplemental brief, at pages 2 and 3:

"* * * The District Court, in the Tort Claims Act cases, found that Eastern *had* been cleared to land, and this Court ruled that such finding was 'amply justified' (Op. p. 33; [95 U.S.App.D.C. 189], 221 F. 2d 62, 79). Under the trial court's charge to the jury, Eastern could have been found liable only if it had *not* been cleared to land. Having found against Eastern the jury necessarily found that Eastern was not cleared to land, thus placing it in direct conflict with the fact finding of the Trial Judge. The result is an extraordinary and unusual situation

1. The pertinent portion of the Rule is as follows:
 "(b) Reservation of Decision on Motion. Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to later determination of the legal questions raised by the motion. Within 10 days after the reception of a verdict, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict * * *. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed. * * *" 28 U.S.C.A.

in which, having heard the same evidence from the same witnesses, at the same time, and on the same record, the court (as a trier of the facts) and jury reach precisely contradictory conclusions. Based upon the court's fact finding, final judgments have been entered against the United States and duly affirmed by this Court and by the United States Supreme Court. The jury finding against Eastern is now before this Court for examination to determine if a new trial should be had.

"It is a self-evidence truth that the same proposition cannot be *true* and *false* at the same time, and under the same aspect. Therefore either the jury was wrong in finding that Eastern *was not* cleared to land, or the Trial Judge was wrong in finding that Eastern *was* cleared to land. The existence of this extraordinary and unseemly conflict of findings speaks most eloquently to the necessity for a new trial."

Before considering the new trial issue, we must decide whether the phase of it suggested in the forgoing quotation remains open after remand, in view of the Supreme Court's decision that the District Court did not err in submitting the clearance question to the jury. We think it is still open. In submitting the clearance question to the jury, the trial judge simply held that, viewing the evidence in a light most favorable to the plaintiffs, an issue of fact had been raised, and in this he has been upheld by the Supreme Court; but he did not weigh or evaluate the evidence pro and con until he ruled on the motion for a new trial, and this ruling has not been passed on by the Supreme Court.

 A holding that a verdict for the defendant should not be directed does not necessarily mean that a verdict against him should not be set aside on a motion for a new trial. There is a clear distinction between a trial judge's duty in ruling on a motion for a directed verdict and his duty in ruling on a motion for a new trial. The distinction is reflected in

Rule 50(b) and is shown in the cases. For example, in Garrison v. United States, 4 Cir., 1932, 62 F.2d 41, Judge Parker said, at page 42:

"* * * Where there is substantial evidence in support of plaintiff's case, the judge may not direct a verdict against him, even though he may not believe his evidence or may think that the weight of the evidence is on the other side; for, under the constitutional guaranty of trial by jury, it is for the jury to weigh the evidence and pass upon its credibility. He may, however, set aside a verdict supported by substantial evidence where in his opinion it is contrary to the clear weight of the evidence, or is based upon evidence which is false; for, even though the evidence be sufficient to preclude the direction of a verdict, it is still his duty to exercise his power over the proceedings before him to prevent a miscarriage of justice. * * *"

In Aetna Casualty & Surety Co. v. Yeatts, 1941, 122 F.2d 350, the Fourth Circuit again discussed the subject, and said at pages 352–353:

"* * * On such a motion [for a new trial] it is the duty of the judge to set aside the verdict and grant a new trial, if he is of opinion that the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict. The exercise of this power is not in derogation of the right of trial by jury but is one of the historic safeguards of that right. Smith v. Times Pub. Co., 178 Pa. 481, 36 A. 296, 35 L.R.A. 819; Bright v. Eynon 1 Burr. 390; Mellin v. Taylor 3 B.N.C. 109, 132 Eng.Reports 351. The matter was well put by Mr. Justice Mitchell, speaking for the Supreme Court of Pennsylvania in Smith v. Times Publishing Co., supra * * * as

follows: 'The authority of the common pleas in the control and revision of excessive verdicts through the means of new trials was firmly settled in England before the foundation of this colony, and has always existed here without challenge under any of our constitutions. It is a power to examine the whole case on the law and the evidence, with a view to securing a result, not merely legal, but also not manifestly against justice,—a power exercised in pursuance of a sound judicial discretion, *without which the jury system would be a capricious and intolerable tyranny*, which no people could long endure. This court has had occasion more than once recently to say that it was *a power the courts ought to exercise unflinchingly.*' (Italics supplied)."

And at page 354, the court said:

"To the federal trial judge, the law gives ample power to see that justice is done in causes pending before him; and the responsibility attendant upon such power is his in full measure. While according due respect to the findings of the jury, he should not hesitate to set aside their verdict and grant a new trial in any case where the ends of justice so require."

The foregoing paragraph was repeated in Virginian Ry. Co. v. Armentrout, 4 Cir., 1948, 166 F.2d 400, 408, 4 A.L.R.2d 1064, with this addition:

"The power of this court to reverse the trial court for failure to exercise the power, where such failure, as here, amounts to an abuse of discretion, is likewise clear. * * *"

Other cases setting forth these principles include the following: Montgomery Ward & Co. v. Duncan, 1940, 311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147; Mt. Adams & E. P. Inclined Ry. Co. v. Lowery, 6 Cir., 1896, 74 F. 463; Felton v. Spiro, 6 Cir., 1897, 78 F. 576; Adams v. United States, 7 Cir., 1940, 116 F.2d 199; General American Life Ins. Co. v. Central Nat. Bank, 6 Cir., 1943, 136 F.2d 821; Marsh v. Illinois Central R. Co., 5 Cir., 1949, 175 F.2d 498; Southern Pac. Co. v. Guthrie, 9 Cir., 1951, 186 F.2d 926, 932, note 10; Snead v. New York Central R. Co., 4 Cir., 1954, 216 F.2d 169.

■■ We conclude, on the authorities and on reason as well, that the trial judge had the power and duty to grant a new trial if the verdicts were against the clear weight of the evidence, or if for any reason or combination of reasons justice would miscarry if they were allowed to stand; and that this court has the power and duty to reverse and order a new trial if the trial judge abused his discretion in denying the motion therefor.

■ As to what has been said so far in this opinion, the court is unanimous. We are not in agreement, however, as to the disposition of the new trial issue. My brothers Edgerton and Fahy take the view that the verdicts were not so clearly against the weight of the evidence or so plainly the result of passion, prejudice and sympathy, or otherwise so unjust that the trial judge can be said to have abused his discretion in refusing to grant a new trial. It follows that this final point urged by Eastern is rejected by a majority of the court and the judgments against the appellant will be affirmed.

I think Eastern Air Lines is entitled to a new trial and that the trial judge abused the judicial discretion committed to him when he denied the motion. Although the discretion is broad and appellate review thereof is limited in scope, I suggest that the denial of a new trial must be held an abuse of discretion when it is demonstrable beyond peradventure that the verdict was flagrantly against the great weight of the evidence and that grave injustice will flow from it. Such is the situation here, in my opinion.

In the first place, a simple statement of what happened on the fatal morning is sufficient to arouse misgivings as to the validity of the jury's verdict. Shortly before noon on a clear, bright day, the Eastern airliner with two experienced pilots and 53 other persons aboard, was

swinging into final approach for landing. The Bolivian pilot, in a warplane so constructed that he could not see before and below him, was hurrying to land because of an ailing engine. He mistakenly thought, without asking the tower, that the plane authorized to land ahead of him on the runway he was approaching had already landed and was out of the way. So he came hurtling downward and, without ever seeing the Eastern plane, struck it from above and behind, cut it in two, and killed the 55 persons who were aboard. Yet the jury said the Bolivian pilot was not negligent, and that the collision was caused by negligence on the part of the airliner's pilot.

There is no basis whatever for exonerating the Bolivian of negligence, as I shall show. The only substantial basis for attributing negligence to the stricken airliner is the charge that it had not been cleared to land and so had unauthorizedly deviated from the pattern when it swung into final approach, and had negligently placed itself in the path of danger. Undoubtedly the jury decided to conclude that the tower had not cleared the Eastern plane for landing,[2] so the weight of the evidence on that subject must be examined.

The tower operator unqualifiedly said he had given clearance to Eastern. He said the liner responded immediately to all his instructions from the time of its first appearance, including his direction to turn, unfortunately given too late, when he saw Bridoux was coming on regardless. The dead pilots are presumed to have done their duty. They were experienced men entrusted with the lives of a large number of people, and were of course imbued with the universal instinct of self-preservation. Moreover, the tower operator was confirmed by Bridoux himself, perhaps unwittingly, when he said the tower told him, "You are No. 2 to land on runway 3." The evidence shows no plane but Eastern which could have been No. 1 to land on that runway.

There was no affirmative evidence tending to show that landing clearance had not been given to the airliner. Lt. Shaw, the National pilot flying near Hains Point, merely said he heard none. His negative testimony is the only basis for the jury's conclusion. Shaw admitted, however, that he could not hear tower messages when his colleague depressed the transmitting key. He was engaged at the controls of a large airplane and did not remember all the tower communications which he did hear.

The jury's finding that Eastern had not been cleared to land, based on such flimsy evidence, when considered in connection with its astonishing verdict in favor of Bridoux, impresses me as having been the product of emotion rather than of evidence. I think the trial judge abused his discretion in not setting aside the verdicts as arbitrarily arrived at, contrary to the overwhelming weight of the evidence.

This brings me to a consideration of the jury's exoneration of Bridoux and the part it probably played in producing the verdicts against Eastern Air Lines. There may be some question as to whether the verdict in favor of the Bolivian pilot, who was of course a defendant in the jury trial along with Eastern, is before us for review since there was no appeal from the judgment thereon. The propriety of the verdict was before the district judge, however, on the motion for a new trial; it was expressly drawn to his attention and he had the power *sua sponte* to grant a new trial of the cases against Bridoux. Sulzbacher v. Continental Casualty Co., 8 Cir., 1937, 88 F.2d 122. Regardless of that, the fact that the jury found for Bridoux is pertinent for consideration; for, if the verdict in his favor was contrary to the weight of the evidence and was dictated by sympathy, as I think it clearly was, the jury's willingness to depart from the evidence and to be swayed by emotion is demonstrated.

2. The appellees urge, unconvincingly, I think, that the jury may have thought Eastern was cleared to land and may have found it negligent for some other reason. The other negligence attributed to Eastern was too slight, and too much dependent upon lack of clearance, to give credence to the argument.

The source of the jury's sympathy for Bridoux is easily seen in his testimony. His story was a moving one, even in cold print. It must have been even more dramatic and appealing when he told from the witness stand in faulty English how he had never seen the Eastern craft, how he plunged into the Potomac, and how he escaped from his plane as it lay on the bottom of the river, although he was grievously injured.

But the fact is that, to all intents and purposes, he admitted guilt of the grossest sort of negligence, except for which the collision would not have occurred. He was flying over the busy National Airport a plane which probably should not have been permitted to ascend into such crowded air because its structural design limited visibility and because it had a defective engine which developed trouble when he had been aloft only a few minutes. He was in a hurry to land.

In this situation, when the tower said in response to his request for landing instructions, "You are No. 2 to land on runway 3," Bridoux said he regarded the statement as actual and absolute landing clearance as soon as he should decide for himself, without further communication from or with the tower, that the No. 1 plane to land on runway 3 was out of the way. Not only did he testify that he so regarded the tower statement when it was made to him, but he also argumentatively insisted from the witness stand that he had correctly interpreted the tower message.

This misinterpretation, due either to stupidity or unfamiliarity with the English language, was the primary cause of the collision, for Bridoux acted in accordance with his misunderstanding. He said he saw a plane on the ground ahead of him which he concluded was the No. 1 plane already landed, and so he thought it unnecessary to check with the tower to learn whether the plane cleared to land before him had actually landed. Instead he proceeded to descend blindly at the rate of 500 feet per minute and at a for-

ward speed of 150 miles per hour. As a consequence he struck the Eastern plane, which he never saw and which was vainly trying to escape from him in response to frantic warning given by the tower operator when he saw Bridoux was not turning to the left as he had been told to do. Bridoux said he heard this instruction but thought it was directed to a plane on the ground. The fact that the Bolivian pilot's mistaken idea that he had been authorized to land without further clearance was the primary cause of the collision is also reflected in these questions to Bridoux and his answers to them:

"Q. It would have prevented this accident, wouldn't it, if you had called the tower and inquired as to the identity of the plane ahead of you? A. Except that I happened to observe this plane on final approach, not any other plane. Therefore I assumed this was the No. 1. This was the only one on final approach.

"Q. And that is where the trouble came in, because you assumed that was the plane that was ahead of you, isn't it, Captain? A. Probably, sir."

In view of the foregoing, it is unthinkable that the jury had any reason except sympathy for finding that the probably judgment-proof Bridoux was not negligent. It was an easy step for such an impressionable jury, through sympathy for the more than 50 dead and their bereaved dependents, to find against the luckless appellant, whose witnesses were killed in the crash.

Other factors, insufficient standing alone to require reversal, may have contributed to the totality of unfairness. For example, the appellees' attempt to show "that the tower statements and testimony did in fact result from mutual consultations between the tower men and their superiors" [3] may have been regarded by the jury as a charge of fabrication and concoction and therefore as an attack on the veracity and integrity of the tow-

3. Appellees' brief on remand, p. 3.

er operators. To be sure, the appellees disclaimed any intention of charging them with corruption, and the court consequently admonished the jury to put out of their minds the idea there was any charge of concocted or fabricated testimony by the tower witnesses. But a jury willing to depart from the evidence so far as to find a verdict for the Bolivian pilot might well have been willing to ignore the court's admonition, and to seize upon the idea of fabrication as a reason for rejecting the tower testimony.

We have seen that it is the duty of a trial judge to grant a new trial when it is clearly necessary to do so in order to prevent a miscarriage of justice. He ought to perform the duty by exercising the power "unflinchingly," as the Pennsylvania court said. It is equally our duty to see that a miscarriage of justice does not result from a jury's verdict. From the same evidence which the jury heard, the trial judge found the tower operators had negligently cleared both Eastern and Bolivian to land on the same runway at approximately the same time, and awarded judgment against the Government principally because of that negligence. Thus he did not agree with the jury on the fundamental issue as to whether Eastern was negligent, but found that its plane had been cleared to land. His finding has in effect been affirmed by the Supreme Court, and I think is conclusively correct. Certainly it was amply justified by the evidence. Had the jury reached the same sound conclusion, it would have been bound to absolve Eastern.

This court's affirmance of the judgments against the appellant produces this anomalous situation: Eastern Air Lines and the United States have both been mulcted in damages because of contrary findings on a single fundamental factual issue. The judgments against both defendants cannot possibly be correct; justice has miscarried either as to Eastern or as to the Government. Since the Supreme Court has affirmed the judgments against the latter,[4] and so has stamped approval on the finding that the Eastern plane was cleared to land, I see no escape from the conclusion that Eastern Air Lines is the victim of injustice.

I would resolve the anomaly by reversing the judgments and remanding the cases for a new trial with directions that, if the evidence on the subject is substantially the same as before, the landing clearance question should not be submitted to the jury, since the question has now, as it had not when the first jury was instructed, been authoritatively answered; other acts of negligence alleged against Eastern, if supported sufficiently by evidence, should be submitted for the jury's consideration. I am unwilling to believe the court is powerless to right the wrong which has been done in these cases.

Affirmed.

---

4. United States v. Union Trust Co., 1955, 350 U.S. 907, 76 S.Ct. 192.